23-2076 United States v. Gutierrez Good morning. My name is Margaret Cates. I'm the federal defender for the District of New Mexico and I'm representing Mr. Gutierrez. I'd like to talk about the fourth Barker factor, that's prejudice to the defendant. And Barker tells us in order to determine whether or not there has been prejudice to the defendant, we have to look at the goals of the constitutional speedy trial right. And so those goals, there's three of them, is to prevent oppressive pretrial incarceration, to minimize the anxiety and concerns of the accused, and to limit the possibility that the defense will be impacted. And so unfortunately, Mr. Gutierrez was subject to oppressive pretrial incarceration. Had the case been timely prosecuted, he would have been sentenced under the provisions of 5G, the mandatory provisions of... Does pretrial incarceration implicate the Speedy Trial Act? Hasn't the case law said if they're going to get credit for that time served anyway, we don't include that in the speedy trial analysis? No, I think there's more to the analysis than just whether or not you're going to get credit for it. It specifically talks about the oppressive conditions as well. And so in this situation, for example, after having served two years in state incarceration on the state case and programming, he got out and he got taken into federal custody, and then he was held in pretrial detention for a year, and he was in a detention center that at that time literally had no programming. And had he been prosecuted timely, the court would have had to have executed the operation of the guidelines by going through 5G 1.3, and the court would have had to have run the remainder of the sentence concurrently. And so he would not have ended up having to be in pretrial incarceration at all. Well, there's also a question in the case law whether sentencing affects, sentencing issues affect your speedy trial right. So this court in Jumeif acknowledged that the possibility that the defendant's sentence can be a valid component of speedy trial analysis in the appropriate case. And this is an appropriate case. Let me interrupt you. It said they haven't cited any cases that has treated the sentence imposed post-conviction as relevant to assessing the constitutional validity of pretrial proceedings, and then they assumed for purposes of analysis that it did and rejected it on the merits. But they certainly raised a question of whether it was a valid consideration. The way I read it is, yes, they raised it as a consideration and acknowledged that it could be a consideration and found that in Jumeif that it was not in fact the case, that it was inapplicable. But then in the appropriate case, the analysis could be... Let me raise one other problem I have with your pretrial incarceration argument, which is you didn't raise it until your reply brief. As far as... No, you raised it, I'm sorry, on the first time on appeal. You didn't raise it in the district court at all. I think that the sort of, the gestalt of the argument was raised in the district court. I think the attorney that represented Mr. Gutierrez in the district court filed a very comprehensive motion to dismiss. And in there, she did talk about the speedy trial rights. I mean, that is what the speedy trial... Those are what the speedy trial rights are. Those are the goals and the intention of the speedy trial rights is that people are prevented from having oppressive pretrial incarceration, minimizing the anxiety and concern. So I think that it was raised at the district court level, the issue of whether or not there was prejudice to the defendant. And so obviously in our appeals, we go into things in more detail, but the issue was certainly raised. Moving on to the second goal of speedy trial, and that is minimizing the anxiety and concern of the accused. That certainly didn't happen here. Mr. Gutierrez was... He had programmed, he was doing well, finished his two years in custody. He was preparing to be released, preparing to return to the community, reintegrating with his family. He was wanting to get back and support his mother and go back to work. And surprise, he found out the day he was being released that he was going back to square one. And then add to that the fact that as COVID was raging in the jails and prisons. And so I think that's a fairly strong indication that that goal of the speedy trial rights did not happen for Mr. Gutierrez. And then the third one is limiting the possibility that the defense will be impacted. And the delay absolutely impaired Mr. Gutierrez's defense because it fundamentally altered the landscape of his sentencing proceedings. Is the Supreme Court squarely held, though, that the Barker factors would apply to post-trial sentencing proceedings? I couldn't find a case that ratified that. And we do have a case we were just discussing in the circuit. I don't have a Supreme Court case. The Betterman v. Montana suggests that there is no constitutional right at sentencing based on... As I read... ...trial delays. As I read Betterman, that addressed the issue of an interest in a right to a speedy sentencing. That's not what we're arguing. We're arguing that... So I don't think Betterman is applicable in this situation. We're arguing... Yes, we are arguing that there are certain things that ended up happening at sentencing that are inextricably intertwined in the delay that occurred, the way that it impacted Mr. Gutierrez, which include, for example, had the case been prosecuted timely, the sentencing guidelines would have been calculated under 5G 1.3. And therefore, the district court would have had to have given credit for the 18 months he'd already served in state custody and would have had to have ordered that the remainder of the sentence be served concurrently. And so he lost... Didn't he get the full credit, potentially? I don't think he did. He got... She said... That's also a little murky in the end. If you read the sentencing transcript, she says she's given him credit for 24 months. She says she's departing upward for 24 months. And then she says she's giving him a sentence that's at the high end of the guidelines. She says she thinks 70 months is the appropriate sentence. But in substance, I think your question is, he served 24 months in state court, in state system. Didn't he get those 24 months? But I don't think it's just that... I don't think it's that clear cut. Because would he have gotten the exact same thing had he been... Had he gotten his speedy trial rights? And here's why I don't think it is... Isn't that wholly speculative, though? Well, I think what happened was... You can say it's speculative, but truthfully, it's actually not that speculative. Because at the time of the motion to dismiss, she already knew this. This wasn't a potential future sentencing argument that she had no way to know. The district court judge knew at the time that she had the motion to dismiss for speedy trial reasons. She already knew the universe we were dealing. She already knew that he had served out his entire state sentence and that she wouldn't be able to run the case concurrently and give him credit for that. So she did know that. And so I don't think it is speculative. She said it's speculative, but in reality, it's not speculative. The universe was what it was. The only thing that changed eventually is her, maybe, upward departure following a case that she relied on. Judge Browning, in our district's case, was the only thing. I'd like to talk about that in a minute. But with respect to the prejudice, in addition to the issue that she wouldn't have been sentencing him, she would have been sentencing him under 5G. Why I think that's important is because the way to the operation of that guideline is to look at the guidelines initially, which were 37 to 46 months, and then she would have had to take 18 months off the guidelines, 18 months that he'd already served. Now it would be 19 to 28 months. And so if she thought the appropriate sentence was 70 months, she would have to justify that departure of more or less 50 months, which would be at least two and a half times more than the underlying sentence. And she didn't give any really substantial justification for that eventual departure. One of the things she did say was that she didn't think that the state court sentence on the aggravated assault was enough, which, as this court had asked that exact same question in previous arguments, that was inappropriate. That's an inappropriate and impermissible reason for her to give that extensive a departure. She owes deference to the state court in the same way that you owe deference to the district court. But the government, I think you partially answered my question, but the 5G 1.3 only would have affected the guideline calculation. It would not have handcuffed the district court from varying upward, which is what happened. So just because your guideline range has changed doesn't really establish prejudice unless we assume a number of what could have happened otherwise. But that's where the speculation is. Now you have to speculate. Would she have been able to substantiate such a significant upward departure? And if I may, only three minutes left. As far as the second Barker factor is the reason for the delay, I think Mr. Gutierrez wins on that. I know that this court in Keyes said that it was a neutral factor. I think it starts as a neutral factor. In our particular situation, it was a simple case. He was detained very close to the courthouse. And even though the government said that the marshal said they couldn't bring writs, there was no evidence actually produced. Contrary to that, the defense produced evidence that, in fact, the government was bringing writs for people. And the most important thing is that under the CARES Act, we had video conferencing. We had court continued. I feel very proud to have been a part of putting that together, that we did all court other than a trial. So there was no reason that he couldn't have – He couldn't be tried. Yeah, but he could get an attorney. He could have an arraignment. He could assert his speedy trial rates. And those are the things that he wasn't allowed to do. And I'd just like to briefly address the impermissible upward departure. Do you know why he didn't receive notice of the indictment? Do I know why? I don't know why. Nobody – Okay. The prison was informed, wasn't it? Well, there's an indication that something was filed with the jail. And I don't know if it was just a detainer. But during the hearing, the evidence was that there was no evidence that he was ever informed of it. And, in fact, the jail said they don't have any procedure to do it. And the federal government didn't do anything. And the federal – and the government didn't inform the court so that the court could have opportunity to set up an arraignment. And I just wanted to quickly address the impermissible upward departure because I think that's really concerning. This court has said in Kelly that the departure for 5K2.6 only applies in cases where a firearm could or could not be used. And that makes sense if you look at the actual language of 5K2.6 that says if a weapon was used in the commission of the offense and Judge Browning in his decision is saying that refers to the felon in possession. That literally makes no sense because every single felon in possession would have to fall the offense being felon in possession. So I don't think that analysis makes sense. Alternatively, though, it is the exact same conduct as the additional four-level enhancement that he received for possessing the firearm in connection with the felony. It's the exact felony. It's the exact same assault, aggravated assault. And so, in the end, he ends up getting punished five times for the same conduct. He gets prosecuted in state court for the aggravated assault. He gets prosecuted in federal court for felon in possession. He gets plus three for the prior aggravated assault in his criminal history. He gets plus four because he committed the felon in possession in connection with another felony. And then, impermissibly, the court upwards departs, which maybe looks like 24 months for the exact same conduct because saying that he possessed the firearm in connection with another felony. And that's just a miscarriage of justice. Why wouldn't your appellate waiver apply? What? I'm sorry? The appellate waiver. Why does it? It doesn't apply. I think my time is up. May I answer? No, go ahead. It doesn't apply for a couple of reasons. Hahn was clear that, so under Hahn, it is not, the disputed appeal does not fall within the scope of the waiver because of the unique situation in which the sentencing factor that I'm talking about, not all the sentencing factors, but specifically that upward departure, is so inextricably connected to the speedy trial issue and the cause by the speedy trial issue that it's not included. And also, how That argument wasn't in the motion to dismiss, right? The appellate waiver carved out your prior motion to dismiss based on speedy trial, right? Right, but But this argument you're making now wasn't in that motion. The motion that the waiver shouldn't The motion to dismiss in the district court for a violation of the Speedy Trial Act. Yes, we did argue that the appellate waiver should not apply, and the reason it That's not my question. My question is, the appellate waiver carves out your motion to dismiss filed in the district court based on speedy trial. This argument that you're making now on appeal was not part of that motion to dismiss in the district court, correct? I'm actually not 100% sure of the answer to that question, Your Honor. But the final thing was that that waiver couldn't have been made knowingly and voluntarily because there was no way to imagine that the Maestas case was going to be decided because that case got, if Mr. Gutierrez's case had moved as expeditiously as it should have, Maestas wouldn't have existed, and that is the only thing that the court, the probation, and the U.S. Attorney's Office relied on for support for that substantial upward variance. And so the last thing, and Han, is it would be a miscarriage to not correct an incorrect guideline calculation. Thank you. Good morning, Your Honors, counsel. May it please the court, Tiffany Walters for the United States. The district court properly weighed the Barker factors and concluded that COVID-related delays in Gutierrez's prosecution did not violate his Sixth Amendment right to a speedy trial. I'd like to jump directly to the prejudice prong, which is, in fact, the prong that this court has recognized, the absence of which is nearly fatal to a speedy trial claim. Case law in the Tenth Circuit has said that when you receive credit for, toward a state sentence for time, that mitigates the oppressiveness of any incarceration. I'd point the court to Garcia, to Frias, Medina. So the bulk of the time we're talking about was time up until May 5, 2022, when Gutierrez did receive credit towards a state sentence. Starting in May 6, he comes into federal custody. We have the time period, a brief time period in May, where he is arraigned, has his initial appearance and all that. And within about a month, he files a motion to continue. And that continues the trial date into September. So all said and done, we have about four and a half months between the time he comes into federal custody, when he's no longer receiving credit toward his state sentence, to the time he pleas. And that's the period we're looking at for a pretrial detention, because Betterman tells us that the clock stops ticking once he is plea, once he's convicted. The speedy trial right detaches. So we're not looking at a one-year period. Then also, I'd like to turn to the argument that the sentence that he received is relevant towards the Speedy Trial Act. The Supreme Court has not held that. This court has not held that. In fact, this court has expressed skepticism in Jumaive and in Nixon that that period of time would be relevant. And I think Betterman provides, while it doesn't directly address this issue, it provides some instruction on it, in that Betterman focuses on the fact that the speedy trial right is designed to protect the accused's rights and to address the concerns with the delay before trial. And when we start getting into the length of the sentence after conviction, that is not the interest that the speedy trial clause is designed to protect. Moving on to the anxiety and concern issue. Before you move on, the way Ms. Katz articulated it was, you know, if the proceedings had been sooner, the guideline range would have been lower. And then at sentencing, if the district court wanted to impose the sentence it did, it would have had to provide a greater explanation than it did here. And so the government got the benefit of the delay because it wasn't required to provide evidence or explanation to the district court to justify a longer sentence. Why isn't that some kind of basic level of prejudice? I think I'd like to start with the contention that the guideline range would have been different. And I think that premise is a faulty premise. Because when we look to 5G 1.3, application note 2D explains how this adjustment occurs. And that takes us through step by step with an example. So in this case, the district court would correctly calculate the guideline range based on the offense level and the criminal history category. And then note 2D directs the district court to determine what would be an appropriate sentence, either within the range, above the range, whatever would be an appropriate sentence in the case. And then the court is directed to adjust that sentence based on the time served or remaining to be served in the state sentence. So there's no new guideline range. The guideline range stays the same. What would be affected as far as the timing and sentencing would be how that, in this case, 24-month reduction for a state sentence would be taken into account in the sentence. So he received a 24-month state sentence. There's no greater amount than 24 months that he could have received credit for in any way, shape, or form. But had he been sentenced federally during the time he was still serving his state sentence, what the district court had discretion, it's not in fact mandatory because after Booker we know that the application of that guideline would not be mandatory. But what the court could have done is said, okay, let's just say hypothetically it happened at the 12-month mark. I will reduce your sentence by 12 months to account for the 12 months you've already served. And then I will run the rest of your, run your federal sentence concurrent with the remaining 12 months on your state sentence. So in the end, what ends up happening is a 24-month adjustment on the state, on the federal sentence. Part of that's taken into account through credit. Part of it's taken into account through concurrent sentence. Here what happened is because the state sentence had been fully served, there's no way to run it concurrently. But there is a way to provide a 24-month reduction. And that's what the district court did in this case. I don't think it would have adjusted the explanation required. Because when we look at the district court, what it did is it said, looking at your conduct. And nothing about the speedy trial claim affects what he did in this case, which is that he possessed a firearm and that with that firearm he committed aggravated assault on his wife by discharging the weapon at an occupied home while holding onto his wife on one of those occasions and while she was running into the home for safety. That is egregious conduct that the district court decided that a 70-month sentence would be appropriate to reflect. And that remains the same. So the district court said 70 months would be appropriate. We would reduce that then by 24 months. And that ends up with a 46-month sentence. So the district court imposed a 46-month sentence, which was at the top of its guideline range to get to that place. Based on both taking into account the egregiousness of the actions, but also taking into account the 24 months that he served. So in the end, I don't think it would have changed anything, is the bottom line. That was a very long explanation to your question, Judge Simcovich. But I think there is no prejudice, whether you consider that under the oppressiveness of pretrial detention or under the impairment of defense. I don't think there's any case law to suggest that impairment of defense encompasses that. But I know that the defense has argued it in that context. But either way, I don't think it matters because there's really no impact on the sentence in this case. And in Tombs, this court has recognized that even where the defendant could demonstrate oppressive pretrial incarceration and anxiety and concern, the failure to demonstrate the impairment of defense is the most important prejudice factor. And without that, the defendant can't have that prejudice factor weigh in his favor. What about the appeal waiver? What is your view of what's in and out of the appeal based on that appeal waiver? So the appeal waiver in this case is clear. It exempts the appeal from the district court's denial of the speedy trial motion, the motion to dismiss the indictment on CB trial grounds. It refers to the docket number of the memorandum opinion that the defendant can appeal. That opinion contains nothing about the sentencing argument. The 5K2.6 appears nowhere in there. The appellate waiver is very clear that it covers the sentence and the manner in which it's determined. And the district court's, whether you call it an upward departure or a guideline sentence, the label really doesn't matter. That is the calculation of the sentence. That falls squarely within the scope of the appellate waiver. I know the defendant has also raised arguments as to miscarriage of justice. But Hahn and Smith foreclosed those arguments. Hahn has said that the question is whether or not the waiver is otherwise unlawful, not whether or not you can identify some sort of potential sentencing error. We don't believe there was any error here. But even if the defendant could identify that, that is not enough to show that there's a miscarriage of justice enforcing the waiver. Well, during argument this morning, counsel stated that the appeal waiver couldn't have been knowing involuntary because of information that the defendant didn't have when he executed it. That struck me as a new argument. I thought that the briefs, there was no argument that it wasn't knowing, that the appeal waiver itself was not knowing involuntary. Am I correct or incorrect? My understanding is the same, Judge McHugh. In fact, I think in our brief we specifically say we're not going to address knowing involuntary because the defendant raised it. And so we have not had an opportunity to address that. In any event, Hahn makes clear that the fact that you couldn't anticipate what might have happened down the road doesn't invalidate an appellate waiver. So I don't think that argument has legs, even if the court were to address it. Moving back to anxiety and concern, I think I haven't addressed that one. Certainly, I think any federal arrestee facing federal charges experiences anxiety and concern. I do think it's a little different. You've committed a crime and you have no knowledge that there's going to be a parallel federal action. You get sentenced to two years in state prison and you go through counting off your calendar and you get to the end thinking, you know, free at last. And all of a sudden you get hit with the new federal charges. I mean, it seems to me that's a different character of surprise, anxiety, concern, particularly given the health concerns at the time with the pandemic. I think there's some level of surprise and shock any time an individual learns that they're facing federal charges. Well, the difference here is that I've been given my sentence and I've duly served it. And I can see how that would be different. But I would say that looking at Tombs, that's not going to be enough without any evidence of impairment of the defense and any evidence of oppressive pretrial incarceration. I mean, here, because he received credit for the bulk of this, we're talking about four and a half months, two of which were because he actually requested that his trial date be continued, which largely Which was a tiny fraction. It was. It was. But at the same time, the time that he didn't receive credit for in state custody amounts to a total of four and a half months in federal pretrial detention. And that's not the type of detention that this court has typically described as oppressive. That's not something so out of character with what typically accompanies the federal process. Do you know why he wasn't given notice? And conversely, why wasn't the government moving this case? I don't know why he wasn't given the notice. The record shows that the government did provide the detainer and the indictment to the Metropolitan Detention Center, but it's silent on, well, other than the Metropolitan Detention Center saying we don't typically provide that. There's no indication as to why he couldn't have been separately notified. So I can't speak to that. And as far as why the government wasn't moving the case, before the district court, we explained that we were given direction by the U.S. Marshals not to writ people from state custody into federal custody. Yeah, but as you pointed out, you were doing video conferencing and, you know, a lot of the busy work could have been handled. Sure. But a lot of the busy work in this case was handled in the first seven days that he was in federal custody. So I don't think that really had a problem was that he couldn't go to trial. And the district court, and that was the focus of the district court. The district court didn't focus on the marshal's policy. The district court said that it found it justified to not bring him over during a time in which the federal jury trials have been suspended in large part. There were some periods of time where they could have been held. But also where state proceedings were pending. And in Nixon, this court has recognized, even outside the context of a global pandemic, that there's an interest in not ping-ponging a defendant back and forth. We didn't know what pretrial litigation would occur in this case. You don't know whether the defendant would consent to a Zoom plea. Perhaps he would, perhaps he wouldn't. Well, we would if you asked him. That's true. That's sort of the difficulty with looking back on this, too, from 2025 to a period of time in 2020 where there was a lot of things in  So, I mean, perhaps there might have been a way to proceed more efficiently knowing what we know now. But there was, you know, the district court itself, when it denied the speedy trial motion, didn't even know that So it can't be evaluated with hindsight knowing what we know now, what the district court didn't have in front of it at the time. If there are no further questions... I have none. Thank you. Thank you, counsel. If you want rebuttal, you can have 90 seconds. You don't have to. We took all your time at the beginning. I think it's disingenuous when the government says that there wouldn't have been a way to do it. We were doing it every day. And 97, at least 97 percent of people in federal criminal cases plead guilty. But they're still entitled to the fundamental rights of knowing what they're charged with and having an attorney and having somebody that can protect their rights. And so that's not an excuse for not honoring Mr. Gutierrez's speedy trial rights. Thank you. Thank you, counsel. Counselor, excused. We appreciate the arguments and the cases submitted.